# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **IVY DELLA JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:10-cv-01125** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI"), as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 14. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 17. Plaintiff has filed a Reply (Docket No. 18), in response to which Defendant has filed a Sur-Reply (Docket No. 21).

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

# I. INTRODUCTION

Plaintiff filed her application for Supplemental Security Income ("SSI") on August 2, 2007,[1] alleging that she had been disabled since July 1, 2007,[2] due to bipolar disorder and a learning disability. *See, e.g.,* Docket No. 10, Attachment ("TR"), pp. 145-47, 168-74. Plaintiff's application was denied both initially (TR 57-58) and upon reconsideration (TR 59-60). Plaintiff subsequently requested (TR 74-76) and received (TR 27-50) a hearing. Plaintiff's hearing was conducted on December 8, 2009, by Administrative Law Judge ("ALJ") Ronald E. Miller. TR 27. Plaintiff and Vocational Expert, Rebecca Williams, appeared and testified. *Id.*

On December 21, 2009, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 9-26. Specifically, the ALJ made the following findings of fact:

> 1. The claimant has not engaged in substantial gainful activity since July 31, 2007, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The claimant has the following severe impairment: bipolar disorder (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the

---

[1]Plaintiff's application date is referenced in the record as both July 31, 2007 and August 2, 2007. Plaintiff's application date is not, however, material to the issues before the Court.

[2]Plaintiff's application (TR 145-47) and the ALJ's decision (TR 12) reference July 1, 2007, as Plaintiff's alleged onset date, while the hearing transcript notes an "amended onset date of July 31st, 2007" (TR 39-40). Plaintiff's alleged onset date is not, however, material to the statements of error presented herein.

undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels which includes no limitations in the ability to lift, carry, stand, walk, sit, climb, balance, kneel, crouch, crawl, stoop, push, pull, reach; but with the following nonexertional limitations: although the claimant may have problems with understanding, remembering, and carrying out detailed instructions, she retains the ability to perform simple 1 and 2 step tasks at a consistent pace and can maintain attention, concentration, and persistence to complete simple 1 to 2 step tasks. These findings are consistent with the assessments of the State agency consultants, Dr. Hermsmeyer, Dr. Tomassetti, and Dr. Trapnell at Exhibits B-4F and B-5F, who are experienced physicians and trained professionals in the Social Security disability program.

4.[*sic*] The claimant has no past relevant work (20 CFR 416.965).

5.    Born on February 20, 1957, the claimant was 50 years old on July 31, 2007, which is defined as an individual closely approaching advanced age (20 CFR 416.963).

6.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

7.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

8.    Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

9.    The claimant has not been under a disability, as defined in the Social Security Act, since July 31, 2007, the date the application was filed (20 CFR 416.920(g)).

TR 14-22.

3

On February 19, 2010, Plaintiff timely filed a request for review of the hearing decision.[3] TR 6-8. On September 30, 2010, the Appeals Council issued a letter declining to review the case (TR 1-5), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III. CONCLUSIONS OF LAW

### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been

---

[3]While the request is dated February 15, 2010, it is stamped as filed on February 19, 2010. TR 6-8.

further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her,* 203 F.3d at 389 (citing *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (citing *Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze,* 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age,

education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 CFR 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181

---

[4]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

(6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in: 1) not according proper weight to the opinions of Ms. Donna Kreuze and Nurse Carrie Brensike, her "treating psychiatric sources"; 2) failing to consider all of the evidence before him, specifically the opinion of Ms. Kreuze; 3) finding that Plaintiff did not meet or medically equal Listing 12.04; 4) finding that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels; 5) not properly considering Plaintiff's subjective limitations; 6) incorrectly evaluating Plaintiff's

7

mental conditions and limitations; 7) relying on the testimony of the vocational expert ("VE");

and 8) not properly considering Plaintiff's obesity. Docket No. 14-1. Accordingly, Plaintiff

maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed,

or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can

be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is

overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery

v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and

immediately award benefits if all essential factual issues have been resolved and the record

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171,

176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Weight Accorded to the Opinions of Plaintiff's Treating Psychiatric Sources

Plaintiff contends that the ALJ should have accorded significant or controlling weight to

the opinions of Plaintiff's "treating psychiatric sources," Nurse Brensike and Ms. Kreuze, rather

than to the non-treating, non-examining State Agency consultants, who did not have an

opportunity to consider the later opinions of Nurse Brensike and Ms. Kreuze. Docket No. 14-1 at

13-17. Plaintiff maintains that both Nurse Brensike and Ms. Kreuze opined that Plaintiff had

8

marked limitations, and that Nurse Brensike's opinion should be entitled to great deference

because, as a psychiatric nurse practitioner, she is a "specialist." *Id.* Plaintiff further maintains

that, as Plaintiff's treating social worker, Ms. Kreuze is an acceptable "other source" under SSR-

06-03p, who can provide insight into the severity of Plaintiff's impairments and how they affect

her ability to function. *Id.* Plaintiff contends that the ALJ substituted his own medical opinion

for that of Plaintiff's treating sources even though their opinions were supported by medical

evidence. *Id.* Plaintiff reiterates these arguments in her Reply. Docket No. 18.

Defendant responds that the Regulations specifically permit the ALJ to consider State

Agency non-examining sources, and further responds that the ALJ's conclusions are supported

by Dr. Gil's consultative examination and by the overall evidence of record. Docket No. 17 at

13-16. Defendant also notes that each of the State Agency physicians at issue holds a more

advanced professional degree than Nurse Brensike and Ms. Kreuze, a fact that the ALJ could

consider when weighing the opinion evidence. *Id.* Defendant argues that, as a Nurse Practitioner,

Nurse Brensike can render "an opinion about the severity of an impairment diagnosed by an

acceptable medical source," but she is "not an acceptable medical source for making any

diagnosis."[5] *Id.* at 16. Regarding the ALJ's treatment of Ms. Kreuze's opinion, Defendant

contends that the ALJ's failure to reference a GAF score "does not render an RFC finding

inaccurate," because GAF scores "are not 'opinions' that must be addressed"; rather, "they are a

tool that may or may not be utilized when reviewing the overall picture." *Id.* at 14, *citing*

---

[5]Whether Nurse Brensike is an acceptable medical source for actually making a diagnosis
is irrelevant since Plaintiff had previously been diagnosed with bipolar disorder, and Nurse
Practitioners are acceptable "other sources" who can render opinions regarding the severity of a
claimant's diagnosed impairment. See *infra* p. 11.

*Howard v. Commissioner*, 276 F.3d 235, 241 (6th Cir. 2002).

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

> Regardless of its source, we will evaluate every medical opinion
> we receive. Unless we give a treating source's opinion controlling
> weight under paragraph (d)(2) of this section, we consider all of the
> following factors in deciding the weight we give to any medical
> opinion.
>
> (1) Examining relationship. Generally, we give more
> weight to the opinion of a source who has examined you than to
> the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more
> weight to opinions from your treating sources, since these sources
> are likely to be the medical professionals most able to provide a
> detailed, longitudinal picture of your medical impairment(s) and
> may bring a unique perspective to the medical evidence that cannot
> be obtained from the objective medical findings alone or from
> reports of individual examinations, such as consultative
> examinations or brief hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature and severity of your
> impairment(s) is well-supported by medically acceptable clinical
> and laboratory diagnostic techniques *and is not inconsistent with*
> *the other substantial evidence in your case record*, we will give it
> controlling weight. When we do not give the treating source's
> opinion controlling weight, we apply the factors listed in
> paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the
> factors in paragraphs (d)(3) through (d)(6) of this section in
> determining the weight to give the opinion. . . .
>
> (3) Supportability. The more a medical source presents
> relevant evidence to support an opinion, particularly medical signs
> and laboratory findings, the more weight we will give that opinion.
> The better an explanation a source provides for an opinion, the
> more weight we will give that opinion. . . .
>
> (4) Consistency. Generally, the more consistent an opinion
> is with the record as a whole, the more weight we will give to that
> opinion.

> (5) Specialization. We generally give more weight to the
> opinion of a specialist about medical issues related to his or her
> area of specialty than to the opinion of a source who is not a
> specialist.
> . . .

20 CFR 416.927(d) (emphasis added). *See also* 20 CFR 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis

for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of

Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical
> source who provides you or has provided you, with medical
> treatment or evaluation and who has, or has had, an ongoing
> treatment relationship with you.

20 CFR 404.1502.

Although a Nurse Practitioner is not among the acceptable medical sources enumerated in

20 CFR 404.1513(a), the Regulations provide that the ALJ may properly:

> [U]se evidence from other sources to show the severity of your
> impairment(s) and how it affects your ability to work. Other
> sources include, but are not limited to -
>
> (1) Medical Sources not listed in paragraph (a) of this
> section (for example, *nurse-practitioners*, physicians' assistants,
> naturopaths, chiropractors, audiologists, and therapists) . . .

20 CFR 404.1513(d)(1) (emphasis added).

Although Nurse Brensike treated Plaintiff at MHC over a period of time, the ALJ

ultimately chose not accord significant weight to the opinions expressed in her medical source

statement because he found that they were inconsistent with the overall medical evidence of

record. TR 18-20. Specifically, the ALJ explained:

Carrie Brensike, APN Psychiatry, completed a medical source statement dated December 1, 2009. Ms Brensike reported that claimant had racing thoughts, mood instability, and poor frustration tolerance. There were co-occurring problems with substance abuse, however she would still have deficits in ability to concentrate and ability to interact with others if she was abstinent. Ms Brensike gave moderate (still able to function satisfactorily) limitations in the ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions. There were marked (substantial loss in the ability to effectively function) limitations in the ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions. There were marked limitations in the ability to interact appropriately with the public, supervisors, and coworkers, and respond appropriately to usual work situations and to changes in a routine work setting.

. . .

The attorney provided a medical source statement completed by Carrie Brensike, a psychiatric nurse practitioner at the mental health center, which included marked limitations in social functioning. However the treatment notes from the Mental Health Cooperative do not support the extremely limited medical source statement. In fact, the narrative reports document improvement with medications with overall good mood and that claimant was doing fine emotionally with no depression, anxiety, or racing thoughts. It is quite remarkable that the Global Assessment of Functioning scores were rated as high as 61 in September 2008 and 60 in June 2009 as this is rarely seen in records from the mental health facility. Therefore, the assessment by Nurse Brenski [*sic*] is not given significant weight.

TR 18, 20, 365-438, and 457-501.

As explained, the ALJ relied on the overall MHC records and treatment narrative in determining that the restrictions contained in Nurse Brensike's medical source statement were too restrictive. Upon reviewing this evidence and Plaintiff's testimony, the ALJ concluded:

Records from the mental health center demonstrate that the claimant remained stable with medications and that medications were helpful in controlling/improving symptoms. During periods

> when claimant was off medications there were increased symptoms
> but overall medications alleviated symptoms when taken
> consistently as prescribed. Claimant had gradually assumed
> custody of 2 of her younger children as well as assuming care for a
> grandson and an infant granddaughter. She performed routine daily
> activities independently including caring for her home as well as 4
> children. She had a boyfriend and interacted adequately with
> school personnel as well as the personnel at the mental health
> center. She exhibited no gross memory deficits. There have been
> no inpatient hospitalizations or emergency room visits in
> connection with mental problems.

TR 18.

It is also notable that Nurse Brensike's last recorded clinical visit with Plaintiff at MHC,

on October 21, 2009, supports the ALJ's findings, and contradicts the restrictions contained in

her December 1, 2009 medical source statement. *Compare* TR 462 *with* 502-04. Regarding the

October 21, 2009 visit, Nurse Brensike noted that Plaintiff denied experiencing any depression

for the prior two weeks; denied experiencing any suicidal or homicidal ideations, audio or visual

hallucinations, or problems sleeping; denied alcohol or drug use; reported experiencing "a little"

anxiety and racing thoughts; reported increased energy and feeling as though she had not been as

irritable with her kids; reported taking her medications as prescribed without side effects;

reported that her mood was "doing a little better"; and reported experiencing "[s]ome

impairments with concentration/memory," which caused her some frustration, but that she was

generally able to remember what she had wanted to say a few minutes later. *Id.* As can be seen,

these treatment notes contradict the limitations contained in Nurse Brensike's December 1, 2009

medical source statement opinions, recounted by the ALJ and quoted above.

The ALJ stated that he declined to accord significant weight to Nurse Brensike's medical

source statement because he determined it was inconsistent with, and unsupported by, other

13

medical evidence. Because Nurse Brensike's opinion was inconsistent with the overall evidence

of record, the ALJ chose instead to accord significant weight to the opinions of reviewing State

Agency physicians Drs. Hermsmeyer, Trapnell, and Tomassetti. TR 20, 294-319. The ALJ

explained:

> Consideration has been given the opinions of State agency
> consultants in accordance with Social Security Ruling 96-6p. The
> assessment by Carl Hermsmeyer, Ph.D., is consistent with an
> ability to perform simple 1 and 2 step tasks at a consistent pace
> with difficulty understanding, remembering, and carrying out
> detailed instructions, and no significant limitations in the ability to
> maintain attention and concentration for extended periods, interact
> appropriately with the general public, supervisors, and coworkers,
> and respond appropriately to changes in the work setting. Upon
> review, John Tomassetti, Ph.D., and Richard Trapnell, M.D.,
> agreed with these findings. This assessment is given significant
> weight in that it is consistent with and supported by the evidence as
> a whole.

TR 20.

While Nurse Brensike treated Plaintiff over a period of time, a fact that would justify the

ALJ's giving greater weight to her opinion than to other opinions as long as her opinion was

consistent with, and supported by, the evidence of record, the ALJ specifically found Nurse

Brensike's medical source statement to be unsupported by other substantial evidence in the

record, including her own assessments. As the Regulations state, the ALJ is not required to give

controlling weight to a treating source's evaluation, specialist or otherwise, when that evaluation

is inconsistent with other substantial evidence in the record. *See* 20 CFR 416.927(d)(2) and 20

CFR 404.1527(d)(2). Instead, when there is contradictory evidence, the treating source's opinion

is weighed against the contradictory evidence under the criteria listed above. *Id.* The ALJ

considered the evidence of record, and found that the findings of the State Agency physicians,

not Nurse Brensike, were consistent with the record as a whole, and particularly with Plaintiff's

2007-09 MHC records. TR 20, 365-438, 457-501. This determination was proper. The ALJ

made a reasoned decision not to accord Nurse Brensike's medical source statement opinions

controlling weight. The ALJ's determination must stand.

Plaintiff also argues that the ALJ "failed to consider, or chose to ignore, the opinion of

Donna Kreuze," one of Plaintiff's social workers.[6] Docket No. 14-1 at 15. Specifically, Plaintiff

contends the ALJ did not accord enough weight to Ms. Kreuze's December 12, 2007 CRG

Assessment, and particularly, to her findings that Plaintiff had marked impairments in several

areas of evaluation. *Id.* at 13 and 15.

Although a social worker is not among the acceptable medical sources enumerated in 20

CFR 404.1513(a), the Regulations provide that the ALJ may properly consider the opinions of

"public and private social welfare agency personnel" in determining the severity of Plaintiff's

impairment(s). 20 CFR 404.1513(d)(3).

On December 12, 2007, Ms. Kreuze performed Plaintiff's intake interview and initial

CRG assessment. TR 384-86, 436. In that CRG assessment, Ms. Kreuze opined that Plaintiff had

marked restrictions in her abilities to: perform activities of daily living; cope with interpersonal

functioning; sustain adequate concentration, task performance, and pace; and adapt to change. *Id.*

Additionally, Ms. Krueze opined that Plaintiff's Global Assessment of Functioning ("GAF")

---

[6]Although Plaintiff refers to Ms. Kreuze as her "treating social worker," the only record
of Ms. Kreuze's interaction with Plaintiff is in her intake interview and the accompanying CRG
assessment from December 12, 2007. TR 384-86, 436.

score at that time was 45.[7] *Id.* In her intake interview, Ms. Kreuze noted that, upon returning to Tennessee, Plaintiff was living in a homeless shelter with her seven-year-old daughter. *Id.* Ms. Kreuze also noted that Plaintiff reported that she had previously experienced good results when taking Prozac and Lithium, but was unhappy with the side effects of her then-current medication, Abilify. *Id.* She additionally noted that Plaintiff had twelve children, with six being under the age of eighteen, but that only her seven-year-old daughter lived with her because the other children had been taken from her by DCS due to her prior drug use. *Id.* She further noted that Plaintiff had no income at that time, but had previously worked as a janitor before being fired because she could not get along with her co-workers. *Id.* Plaintiff complained to Ms. Kreuze of experiencing difficulty in dealing with activities of daily living; anxiety; irritability; depression; racing thoughts; paranoia; decreased appetite, sleeping, and energy; and occasional periods of suicidal ideation. *Id.* Plaintiff reported her prior drug use and hospitalizations, and Ms. Kreuze observed that Plaintiff was cooperative and receptive to getting help. *Id.*

Despite Plaintiff's contention that the ALJ "failed to consider, or chose to ignore, the opinion of Donna Kreuze," the ALJ, when assessing Plaintiff's RFC, specifically discussed both Ms. Kreuze's intake interview and CRG assessment. TR 17, 19, 384-86, 434. While not mentioning Ms. Kreuze by name, the ALJ discussed her December 12, 2007 record as follows:

> Records from the Mental Health Cooperative dated December 12, 2007 to October 21, 2009, showed diagnoses of bipolar disorder, most recent episode mixed, severe without psychosis; cocaine dependence; and alcohol abuse. Current Global Assessment of Functioning score was 45. Claimant denied use of crack cocaine

---

[7] A GAF score of 45 indicates serious symptoms or any serious impairment in social, occupation, or school functioning.

for 7 years but had a relapse 2 months previously.[8] Last use of
alcohol was December 2007. Claimant had just moved back to
Tennessee where she was living at a shelter with her 7 year old
daughter. Claimant had 12 children in all ranging from age 7 to 37
with 6 under age 18. She did not have custody of the minor
children as they were taken from her by DCS due to past drug use.
There had been a good response to previously prescribed Lithium
and Prozac.

TR 17 (footnote added).

While Plaintiff focuses on her December 2007 GAF score of 45 as evidence of her

disability, the ALJ, in his decision, not only noted Ms. Kreuze's December 2007 assessed GAF

score of 45, but also Plaintiff's subsequent GAF scores of 61 in September 2008 (TR 381-83)

and 60 in June 2009 (TR 458-60). TR 19-20. The ALJ explained that a GAF score of 55-60

indicates moderate symptoms or difficulty, and that a GAF score of 61 indicates some mild

symptoms or difficulty. TR 19.

Regarding Ms. Kreuze's December 2007 assessed GAF score of 45, the ALJ stated:

While the low scores of 45 and 48 are an attempt to get a reading
of the clinician's assessment of the patient's functioning and are
useful in planning treatment, they are not indicative of the response
to treatment and medications over time. The ratings are not part of
a standardized test and are of limited usefulness. It is just one piece
of data and must be considered in the context of the record as a
whole to obtain a longitudinal picture of the overall degree of
functional limitation based on the extent to which the impairment
interferes with the ability to function independently, appropriately,
effectively, and on a sustained basis.

TR 19-20.

In order to obtain a longitudinal picture of Plaintiff's overall degree of functional

limitation, the ALJ considered the MHC progress notes in their entirety. TR 17-20. These records

---

[8]Plaintiff's December 17, 2007 notes mention her relapse. TR 429.

demonstrate that Plaintiff continued treatment at MHC for two years following Ms. Kreuze's

2007 assessment, and that during those two subsequent years, she had several different case

managers, care providers, and additional CRG assessments. TR 17-20, 364-438, and 457-501.

As discussed above, these records support the ALJ's decision that Plaintiff's limitations were not

as severe as Ms. Kreuze had opined.

The ALJ's explicit discussion of Ms. Kreuze's assessment, intake notes, and GAF scores

demonstrates that, contrary to Plaintiff's assertion, he did consider her records. Moreover, the

ALJ's detailed discussion of the evidence of record, including MHC treatment records,

demonstrates that the ALJ reached a reasoned decision and did not simply "[choose] to ignore"

her records. Plaintiff's argument on this point fails.

Plaintiff also argues that the ALJ erred in giving "controlling weight" to the opinions of

the State Agency reviewing physicians. Docket No. 14 at 13,16. Plaintiff is correct in her

assertion that the opinions of non-treating, non-examining sources can never be entitled to

"controlling weight" (Docket No. 14-1 at 13-14, 16), but Plaintiff is incorrect in her assertion that

the ALJ attributed "controlling weight" to the State Agency physicians' opinions (*see* TR 9-26).

Rather, after extensively reviewing the entirety of the MHC records, and the evidence of record

as a whole, the ALJ determined that the opinions of the State Agency reviewing physicians were

consistent with, and supported by, the overall evidence of record, and he accorded their opinions

significant weight. TR 20.

As discussed above, when there is contradictory opinion evidence, the ALJ is to consider

all the evidence of record and reach a reasoned decision. The ALJ is charged with rendering the

ultimate decision regarding the weight to be accorded each opinion. The ALJ in the case at bar

considered the evidence of record, determined that the findings of the State Agency physicians were consistent with the record as a whole, and accorded their opinions significant weight. TR 20, 365-438, 457-501. This determination was proper. Plaintiff's argument fails.

## 2. Considering All Available Evidence

As discussed in the previous statement of error, Plaintiff argues that the ALJ "failed to consider, or chose to ignore," Ms. Kreuze's opinion. Docket No. 14-1 at 15-16. Plaintiff asserts that because the ALJ "failed to consider, or chose to ignore, Ms. Kreuze's opinion," the ALJ did not consider all of the available evidence. *Id.* Instead, Plaintiff asserts that the ALJ used a "canned language" template that did not provide for any in-depth analysis or true consideration of all the facts. *Id.*

Defendant responds that the ALJ's decision is not "canned," but rather, follows a logical order with a detailed discussion of all factors relevant to a determination of disability. Docket No. 17 at 22. Defendant also notes that the law does not require the ALJ to explicitly evaluate every piece of record evidence in his decision. *Id.* (citing *Walker v. Secretary*, 884 F.2d 241, 245 (6th Cir. 1989), and *Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir. 1988)).

As an initial matter, as discussed in the statement of error above, Plaintiff's argument fails because the ALJ explicitly discussed the records of Ms. Kreuze. The ALJ's statements regarding the records of Ms. Kreuze have been quoted on pages 16-17 above, and will not be repeated here. The quoted passages demonstrate that the ALJ actually considered her records, and did not simply use a "canned language template that did not provide for any in-depth analysis or true consideration of all the facts." As has been discussed, the ALJ properly considered Ms. Kreuze's opinion in his thorough evaluation of the evidence of record, even though he did not

19

specifically reference her by name. TR 17, 19-20, 384-86. As noted, after evaluating her records, and the record as a whole, the ALJ determined that Ms. Kreuze's opinion did not accurately represent Plaintiff's limitations. TR 17, 19-20. This determination was proper.

Although Plaintiff contends that the ALJ failed to consider all of the evidence of record, she cites only to the records of Ms. Kreuze as records that the ALJ "failed to consider." Plaintiff does not contend that there were other records that the ALJ failed to consider, and the record here is replete with doctors' evaluations, medical assessments, progress notes, and the like, all of which were properly considered by the ALJ in his decision, and all of which constitute "substantial evidence." The ALJ's decision demonstrates that he carefully considered all available evidence in making his disability determination; thus, Plaintiff's argument fails.

### 3. Listing 12.04

Plaintiff argues that the ALJ erred in determining that Plaintiff's mental impairment did not meet Listing 12.04. Docket No. 14-1 at 9-12. Plaintiff asserts that she does meet the criteria for Listing 12.04(A), (B), and (C). *Id.* As support for her assertion, Plaintiff relies largely on the opinions of Ms. Kreuze and on Nurse Brensike's medical source statement. *Id.* Alternatively, Plaintiff argues that because the ALJ did not consult a medical expert to determine medical equivalency, this case should be remanded for such testimony. *Id.* Plaintiff reiterates this argument in her Reply. Docket No. 18.

Defendant responds that the overall medical evidence of record provides substantial evidence that supports the ALJ's determination. Docket No. 19 at 16-19.

Listing 12.04 provides in relevant part:

12.04 *Affective disorders*: Characterized by a disturbance of mood,

accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

. . .

>3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

>1. Marked restriction of activities of daily living; or

>2. Marked difficulties in maintaining social functioning; or

>3. Marked difficulties in maintaining concentration, persistence, or pace; or

>4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

>1. Repeated episodes of decompensation, each of extended duration; or

>2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

>3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an

indication of continued need for such an arrangement.

20 CFR Pt. 404, Subpt. P, App. 1, 12.04.

Paragraph C of Section 12.00 for mental disorders explains:

> C. *Assessment of severity.* We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s). We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of marked decompensation. Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. See §§ 404.1520a and 416.920a.

20 CFR Pt. 404, Subpt. P, App.1, 12.00(C).

If Plaintiff's mental impairment satisfies the criteria of Listing 12.04, then "benefits are owing without further inquiry." 20 CFR 404.1520.

In order to meet or equal Listing 12.04, Plaintiff must establish that she satisfies the A *and* B criteria, *or* the C criteria. The ALJ in the case at bar found that Plaintiff satisfied the paragraph A criteria,[9] but that Plaintiff did not satisfy the paragraph B criteria.

Regarding the "paragraph B" criteria of Listing 12.04, the ALJ stated:

> In activities of daily living, the claimant has mild restriction. The claimant performed routine daily activities independently.
>
> In social functioning, the claimant has moderate difficulties.

---

[9]Because the ALJ found that Plaintiff satisfied the "paragraph A" criteria, and Plaintiff does not take issue with this finding, the undersigned will not discuss the evidence satisfying the "paragraph A" criteria.

Although the claimant had some limitations in this area, there was no indication that she would act inappropriately toward coworkers or supervisors.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant demonstrated difficulty in maintaining concentration that could impair the ability to complete complex, detailed tasks efficiently, but she could still adequately perform simple and low level detailed tasks.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied.

TR 15 (footnotes omitted).

As to the first of the "paragraph B" criteria, for the reasons discussed below, substantial evidence supports the ALJ's determination that Plaintiff is only mildly restricted in her activities of daily living. Activities of daily living "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for . . . grooming and hygiene . . ." 20 CFR Pt. 404, Subpt. P, App.1, 12.00(C)(1). Plaintiff cites Ms. Kreuze's opinion from her CRG assessment that Plaintiff suffered from "marked" restrictions in her activities of daily living (Docket No. 14-1 at 9) as support for her assertion that she meets the "paragraph B" criteria, but, as has been discussed, the ALJ properly determined that Ms. Kreuze's opinion was not consistent with the overall evidence of record. As quoted above, the ALJ, in his determination, specifically noted:

Claimant had gradually assumed custody of 2 of her younger children as well as assuming care for a grandson and an infant granddaughter. She performed routine daily activities

23

> independently including caring for her home as well as 4 children.
> She had a boyfriend and interacted adequately with school
> personnel as well as the personnel at the mental health center.

TR18.

The ALJ's assessment is consistent with Plaintiff's MHC records discussed above.

Additionally, Dr. Hermsmeyer opined that Plaintiff had only mild restriction in her activities of

daily living, and that Plaintiff's mental impairments did not meet or equal any mental listing. TR

294-306 ("The mental status exam and the activities of daily living indicate the severity does not

meet or equal any mental listing . . ."). Dr. Trapnell also agreed with this assessment. TR 308. As

discussed in the first statement of error above, the ALJ considered and accepted the opinions of

Drs. Hermsmeyer and Trapnell, because they were consistent with, and supported by, the

evidence of record. TR 20.

Regarding the second of the four paragraph B functional areas, the ALJ determined that

the record did not indicate that Plaintiff had marked difficulties in maintaining social functioning.

TR 18-20. Social functioning involves a claimant's "capacity to interact independently,

appropriately, effectively, and on a sustained basis with other individuals." 20 CFR Pt. 404,

Subpt. P, App. 1, 12.00(C)(2). Plaintiff again cites her 2007 records from Centerstone and the

opinions of Ms. Kreuze and Nurse Brensike as support for her contention that she has marked

difficulties in maintaining social functioning. Docket No. 14-1 at 9; TR 225-41, 363, 384-86, and

502-04. Upon considering all of Plaintiff's MHC records, the ALJ noted that her most recent

records showed improvement since her 2007 visits to Centerstone. TR 16-20. Specifically, the

ALJ noted improvement, and that Plaintiff's symptoms had stabilized with medication, that her

GAF scores had risen to 60 and 61, and that she had assumed care of her children and

24

grandchildren even though it added stress. *Id. Compare* TR 225-41 *with* TR 457-501. In discussing Plaintiff's social functioning, the ALJ noted:

> . . . She had a boyfriend and interacted adequately with school personnel as well as the personnel at the mental health center.
>
> . . .
>
> . . . Although claimant had difficulty coping with four children, she had voluntarily assumed the care of two who were her grandchildren. Symptoms were stabilized/improved with proper medications which allowed her to perform daily activities independently and interact adequately with others. When considering the record as a whole, there is no basis for a conclusion that limitations in mental functioning were at more than a moderate level.

TR 18, 20.

The ALJ's decision that Plaintiff had only moderate limitations in social functioning is also supported by the most recent MHC progress notes, and is consistent with the findings of the State Agency physicians as discussed above. TR 289-319, 457-501.

As to the third paragraph B functional area, the ALJ found no evidence in the record to support that Plaintiff suffered marked difficulties in her ability to maintain concentration, persistence, or pace. TR 18-20. Maintaining concentration, persistence, or pace involves "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 CFR Pt. 404, Subpt. P, App. 1, 12.00(C)(3). The ALJ observed:

> . . . She exhibited no gross memory deficits.
>
> . . .
>
> Claimant stated that she had never had a real job due to her many pregnancies. However, as a self employed babysitter she earned $11,800 in 2003 and $9,116 in 2004. In addition, she worked

25

several months as a cashier and janitor. While it is questionable as to whether these jobs demonstrated relevant work activity, they do reflect an ability to perform a significant amount of work related activities and suggest at least an ability to meet the physical *and mental* demands of unskilled work activity.

. . .

. . . The assessment by Carl Hermsmeyer, Ph.D., is consistent with an ability to perform simple 1 and 2 step tasks at a consistent pace with difficulty understanding, remembering, and carrying out detailed instructions, and no significant limitations in the ability to maintain attention and concentration for extended periods . . . . Upon review, John Tomassetti, Ph.D., and Richard Trapnell, M.D., agreed with these findings. This assessment is given significant weight in that it is consistent with and supported by evidence as a whole.

TR 18-20 (emphasis added) (citations omitted).

Again, Plaintiff relies on Ms. Kreuze's finding of marked restrictions in this area as support for her assertion that she suffers from marked restrictions. Docket No. 14-1 at 10. As repeatedly discussed above, however, Ms. Kreuze's opinion is inconsistent with the overall evidence of record, and the ALJ did not accept her finding of marked restrictions. As has also been discussed, the ALJ's determination is supported by the MHC progress notes, as well as the findings of Drs. Hermsmeyer, Trapnell, and Tomassetti. TR 15, 20, 294-319, and 457-501.

Finally, with respect to the last of the paragraph B functional areas, the ALJ did not find any evidence of decompensation within the record. TR 18-20. Episodes of decompensation are:

[E]xacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two) . . . .

26

> The term repeated episodes of decompensation each of extended duration . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

20 CFR Pt. 404, Subpt. P, App. 1, 12.00(C)(4)

The ALJ noted that the record did not contain any evidence that Plaintiff had suffered any episode of decompensation within the year prior to the hearing. TR 15, 457-501. The ALJ observed that while Plaintiff's children caused her stress, there was no indication of this exacerbating her symptoms. TR 20, 457-501. The ALJ also noted that "[t]here have been no inpatient hospitalizations or emergency room visits in connection with mental problems." TR 18. Dr. Hermsmeyer, whose opinion the ALJ accorded significant weight, also found that Plaintiff did not experience any episodes of decompensation within the prior year. TR 20, 304. The ALJ considered the record as a whole and appropriately determined that Plaintiff there was no evidence to indicate that Plaintiff had experienced any episodes of decompensation within the relevant time period. TR 15.

As has been discussed above, Plaintiff cannot meet Listing 12.04 by satisfying only the "paragraph A" criteria; rather, Listing 12.04 requires the satisfaction of *both* the A *and* B criteria (*or* the "paragraph C" criteria, which will be addressed below). As the ALJ properly explained, because Plaintiff's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, the 'paragraph B' criteria are not satisfied." TR 15. Accordingly, the only remaining way that Plaintiff could meet Listing 12.04 is by satisfying the "paragraph C" criteria.

Regarding the "paragraph C" criteria, the ALJ stated:

> The undersigned has also considered whether the "paragraph C"

criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The evidence does not document the severity of a mental disorder that has caused more than moderate limitations in functioning.

TR 15.

Plaintiff argues that she satisfies the "paragraph C" criteria because: (1) she has a medically documented history of Bipolar I Disorder that has been of at least two years duration and has caused more than a minimal limitation in her ability to do basic work activities, with signs or symptoms that were then-currently attenuated by medication or psychosocial support; and (2) she has a "residual disease process" of "cocaine dependence and alcohol abuse versus dependence" that has resulted in "such marginal adjustment that even a minimal increase in mental demands or change in the environment" would result in marked impairments, and would be "predicted to cause" her to decompensate. Docket No. 14-1 at 10.

As an initial matter, Plaintiff's long history of problems with drugs and alcohol is well documented in the record. TR 16-21, 239-43, 255, 289-93, 365-438, and 457-501. The record fails to establish, however, evidence that supports Plaintiff's contention that her "residual disease process" "has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate." 20 CFR Pt. 404, Subpt. P, App. 1, 12.04(C)(2). In fact, as can be seen in the quoted passages of the statements of error above, the ALJ discussed considerable changes in Plaintiff's life that did not cause her to decompensate. *See, e.g.,* TR 18 (*i.e.* caring for her children and grandchildren, etc.). While Plaintiff argues that her previous hospitalizations and suicide attempts support her argument (Docket No. 14-1 at 10), the ALJ discussed the evidence demonstrating that she

28

showed improvement in the two years before the hearing (and subsequent to her hospitalizations and suicide attempts) (*see, e.g.*, TR 20). The ALJ also specifically noted Plaintiff's improvement when she took her medication. TR 20. The ALJ ultimately determined that the evidence of record did not indicate that Plaintiff suffered from more than moderate limitations in functioning. TR 15. The ALJ's decision is supported by substantial evidence within the record for the reasons discussed above. For the reasons discussed, Plaintiff does not satisfy the "paragraph C" criteria, and cannot use that basis for meeting Listing 12.04.

For the forgoing reasons, Plaintiff's argument that the ALJ erred in finding that she did not meet or equal Listing 12.04 fails.

Plaintiff next argues that the ALJ failed to consult a medical expert ("ME") in concluding that her impairments did not meet or medically equal a listing. Docket No. 14-1 at 12. The ALJ has the ultimate responsibility for ensuring that every plaintiff receives a full and fair hearing. *Lashley v. Secretary*, 708 F.2d 1048, 1051 (6th Cir. 1983). In carrying out this responsibility, the Regulations provide the ALJ with considerable discretion in deciding whether it is necessary to obtain testimony from an ME regarding the nature and severity of an impairment (including whether the impairment meets or equals a listing). 20 CFR 404.1527(f)(2)(iii) ("Administrative law judges *may* also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart."). Additionally, the Social Security Rulings provide guidelines as to when obtaining testimony from a ME would be warranted. SSR 96-6p states:

> [A]n administrative law judge and the Appeals Council must

obtain an updated medical opinion from a medical expert in the
following circumstances:

When no additional medical evidence is received, but in the
opinion of the administrative law judge or the Appeals Council the
symptoms, signs, and laboratory findings reported in the case
record suggest that a judgment of equivalence may be reasonable;
or

When additional medical evidence is received that in the opinion
of the administrative law judge or the Appeals Council may change
the State agency medical or psychological consultant's finding that
the impairment(s) is not equivalent in severity to any impairment in
the Listing of Impairments.

1993 SSR LEXIS 3.

Neither of these circumstances is present in the case at hand. Both the ALJ and the

Appeals Council considered the entire record and reached reasoned decisions based on the

evidence discussed above. Given the facts of the case at bar, the ALJ did not need to obtain

testimony from a medical expert in order to determine whether Plaintiff's impairments met or

equaled a listing. Plaintiff's argument fails.

## 4. Residual Functional Capacity

Plaintiff maintains that the ALJ erred by finding that Plaintiff retained the residual

functional capacity ("RFC") to perform a full range of work at all exertional levels. Docket No.

14-1 at 12-15. Specifically, Plaintiff argues against the assumption within this RFC finding that

Plaintiff would be able to perform heavy work, which involves lifting more than 100 pounds at a

time with frequent lifting or carrying of objects weighing 50 pounds or more. *Id.* Plaintiff

proffers the opinions of Ms. Kreuze and Nurse Brensike as support for her contention that she is

unable to work, much less perform heavy work.[10] *Id.* Plaintiff reiterates this argument in her

Reply. Docket No. 18.

Defendant responds that Plaintiff's argument regarding her inability to perform work at

the heavy exertional level is moot because "the VE identified jobs at the sedentary, light and

medium exertional levels." Docket No. 17 at 13.

"Residual Functional Capacity" is defined as the "maximum degree to which the

individual retains the capacity for sustained performance of the physical-mental requirements of

jobs." 20 CFR Pt. 404, Subpt. P, App. 2, 200.00(C). With regard to the evaluation of physical

abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and
> extent of your physical limitations and then determine your residual
> functional capacity for work activity on a regular and continuing
> basis. A limited ability to perform certain physical demands of work
> activity, such as sitting, standing, walking, lifting, carrying, pushing,
> pulling, or other physical functions (including manipulative or
> postural functions, such as reaching, handling, stooping or
> crouching), may reduce your ability to do past work and other work.

20 CFR 404.1545(b).

Plaintiff correctly states that the ability to perform heavy work includes lifting objects

weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50

pounds or more. 20 CFR 404.1567(d). Plaintiff, however, did not claim disability due to

physical impairments or restrictions. In fact, Plaintiff's application for SSI lists only bipolar

disorder and a learning disability as the "illnesses, injuries, or conditions" limiting her ability to

---

[10]Plaintiff's contention on this point is regarding physical RFC limitations, but Ms.
Kreuze's and Nurse Brensike's opinions are regarding mental limitations. For this reason, and
because those opinions have been discussed fully above, they will not be discussed again here.

work. TR 169. Additionally, Plaintiff testified as follows regarding her disabilities:

> ALJ - What is the major, number one physical or mental impairment that would keep you from working if you had a job?
>
> A - Because I can't get along with people. I don't like to be around people too much. I get nervous, angry or, I don't know.
>
> . . .
>
> ALJ - Do you have any other problems that keep you from working?
>
> A - Uh-uh, no.

TR 36-37.

With regard to potential physical impairments, the ALJ stated:

> The record does not provide a basis for a "severe" physical impairment. Claimant was treated for hypertension and pain in the shoulders and feet which was described as moderate. Physical examination revealed normal musculature, no skeletal tenderness or joint deformity, and normal extremities. Conservative measures were used with a good response to medication. Therefore, it is determined that symptoms were not at a level of severity as to be "severe" for 12 continuous months.
>
> The findings do not substantiate a basis for an intensity, severity, and frequency of a level of pain that would significantly interfere with work related activities as documented by records from treating sources and examining sources as discussed in the preceding paragraphs, and as evidenced by the claimant's presentation and level of independent functioning. There were complaints of shoulder and foot pain in 2008 and 2009. However, physical examination was within normal limits and there are no objective tests to establish a basis for a definitive diagnosis.

TR 19.

When rendering his RFC determination, the ALJ noted that Plaintiff's ability to perform

work at all exertional levels, including heavy work, had been compromised by nonexertional limitations. TR 21. Regarding these nonexertional limitations, the ALJ stated as follows:

> [A]lthough the claimant may have problems with understanding, remembering, and carrying out detailed instructions, she retains the ability to perform simple 1 and 2 step tasks at a consistent pace and can maintain attention, concentration, and persistence to complete simple 1 to 2 step tasks. These findings are consistent with the assessments of the State agency consultants, Dr. Hermsmeyer, Dr. Tomassetti, and Dr. Trapnell at Exhibits B-4F and B-5F, who are experienced physicians and trained professionals in the Social Security disability program.

TR 15.

Additionally, in response to the ALJ's appropriately posed hypothetical questions, the VE identified "millions, millions of jobs" that would be available at the sedentary, light, and medium levels of exertion that would be appropriate for the hypothetical claimant, but did not identify any jobs that would require heavy work. TR 21-22, 45-48. As noted above, the ALJ, after evaluating all of the evidence of record and Plaintiff's reported level of activity, ultimately determined that Plaintiff retained the RFC to perform a full range of work with certain nonexertional limitations. TR 15-21. The ALJ properly evaluated the evidence in reaching this RFC determination, and the Regulations do not require more. Plaintiff's argument fails.

## 5. Plaintiff's Subjective Complaints

Plaintiff contends that in finding that her subjective complaints of limitations were not fully credible, the ALJ did not appropriately address her symptoms. Docket No. 14-1 at 19-21. Plaintiff also contends that the ALJ did not adequately explain his reasoning for discrediting Plaintiff's complaints; but instead, offered only a "single, conclusory statement" that the

statements concerning the intensity, persistence, and limiting effects of her symptoms were not

credible. *Id.* at 20. Plaintiff argues that the record contains over 270 pages of medical records

demonstrating that she has complained for years of chronic symptoms, resulting in significant,

documented limitations. *Id.* Plaintiff contends that the ALJ ignored the consistencies within the

record that support her complaints. *Id.* In particular, Plaintiff asserts that the ALJ improperly

focused on her ability to perform simple functions and applied a "sit and squirm" test to discredit

Plaintiff based on her presentation at the hearing. *Id.*

Defendant argues that the ALJ's credibility determination was proper. Docket No. 17 at

9-11. In support of that argument, Defendant notes contradictions within Plaintiff's complaints,

including, *inter alia*, Plaintiff's claim that she is unable to read, but yet she completed a work

history form and an activities questionnaire; the inconsistencies reported in the MHC records

regarding Plaintiff's reported drug use or non-use; and Plaintiff's claims that she never had a

"real" job, yet records show she babysat and worked as a cashier, stock person, and janitor. *Id.*

The Regulations establish a two-step process for evaluating a claimant's subjective

allegations of disabling symptoms. *See* 20 CFR 416.929 and SSR 96-7p. The Sixth Circuit has

set forth the following criteria for assessing a plaintiff's subjective complaints:

> [S]ubjective allegations of disabling symptoms, including pain,
> cannot alone support a finding of disability . . . [T]here must be
> evidence of an underlying medical condition *and* (1) there must be
> objective medical evidence to confirm the severity of the alleged
> pain arising from the condition *or* (2) the objectively determined
> medical condition must be of a severity which can reasonably be
> expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d

Sess. 24) (emphasis added); *see also* 20 CFR 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled . . . ."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations . . . if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").

When analyzing a claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (construing 20 CFR 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

A review of the ALJ's opinion in the instant case reflects that the ALJ applied the appropriate legal standard in assessing Plaintiff's subjective complaints and in determining Plaintiff's credibility. The ALJ discussed Plaintiff's testimony, *inter alia*, that she was depressed, could not get along with people, drank alcohol and had previously used drugs, had never held a real job because of her many pregnancies, and did not suffer side effects from her medications. TR 18. With regard to the objective medical evidence, as has been analyzed above, the ALJ

35

properly discussed the records and opinions of, *inter alia*, the MHC care providers and Drs.

Hermsmeyer, Trapnell, and Tomasetti. TR 20.

After considering the medical and testimonial evidence of record, the ALJ explained:

> [T]he claimant's statements concerning the intensity, persistence
> and limiting effects of these symptoms are not credible as
> documented by records from treating sources and examining
> sources as discussed in the preceding paragraphs, and as evidenced
> by the claimant's presentation and level of independent
> functioning. Claimant's mental issues were adequately addressed
> through treatment and medications. The record does not provide a
> basis for difficulties and/or symptoms that were unmanageable or
> unresponsive to medications or other forms of treatment with the
> narrative reports from the mental health facility demonstrating a
> good response to medications with improvement/control of
> symptoms.

TR 20-21.

As can be seen, contrary to Plaintiff's argument, the ALJ did not simply offer "a single,

conclusory statement" regarding his decision to discount the credibility of Plaintiff's subjective

complaints. Rather, the ALJ explained that Plaintiff's subjective complaints were contrary to the

documented records from treating and examining sources, to her presentation at the hearing, to

her own reported daily activities and level of independent functioning, and to her documented

improvement through medication and treatment. The ALJ's decision properly discussed

Plaintiff's "activities; the location, duration, frequency and intensity of claimant's pain; the

precipitating and aggravating factors; the type, dosage and effect of medication; and the other

treatment or measures to relieve pain." *Felisky*, 35 F.3d at 1039 (construing 20 CFR

404.1529(c)(2)).

It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective limitations and reach a credibility determination. *See, e.g., Walters*, 127 F.3d at 531; *Kirk*, 667 F.2d at 538. An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters*, 127 F.3d at 531 (citing *Villarreal v. Secretary*, 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (internal citation omitted); *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987). When the ALJ's assessment of credibility is supported by substantial evidence, it must be given great deference. *Walters* 127 F.3d at 531.

The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

**6. Plaintiff's Mental Condition**

Plaintiff argues that the ALJ failed to consider the longitudinal symptoms and limitations caused by her bipolar disorder. Docket No. 14-1 at 21-23. Plaintiff relies on the opinions of Ms. Kreuze and Nurse Brensike's medical source statement as support for this contention. *Id.*

37

Defendant did not directly respond to this claim, but, as has been discussed above, has responded to the opinions expressed by both Ms. Kreuze and Nurse Brensike. *See* Docket No. 17.

Regarding this claim, Plaintiff fails to offer any evidence in the record that supports her allegation of longitudinal symptoms and limitations that are more severe than those recognized by the ALJ. As discussed above, the ALJ examined all of the available evidence and determined that Ms. Kreuze's and Nurse Brensike's opinions were not supported by the overall evidence of record. Substantial evidence supports the ALJ's findings regarding Plaintiff's mental condition and limitations for the reasons discussed above; therefore, Plaintiff's argument fails.

### 7. Reliance on the Vocational Expert's Testimony

Plaintiff asserts that because the ALJ failed to adequately consider her subjective complaints and mental limitations in determining her RFC and in formulating the hypothetical questions posed to the vocational expert ("VE"), the ALJ could not rely upon the testimony of the VE, as it was unreliable. Docket No. 14-1 at 23.

Defendant responds that the ALJ's hypothetical questions posed to the VE accurately reflected the ALJ's determined RFC as he determined to be credible. Docket No. 17 at 20-22. Accordingly, Defendant contends that the ALJ could properly rely upon the testimony of the VE. *Id.*

The ALJ based his questioning on his RFC assessment, and then modified it to pose other hypothetical questions incorporating some of Plaintiff's subjective complaints and some of Nurse Brensike's findings. TR 45-49. Additionally, the ALJ's hypothetical questions posed to the VE incorporated Plaintiff's nonexertional limitations, as well as Plaintiff's age, education, and work

experience. *Id.* The ALJ specifically asked:

ALJ -   What I'd like for you to do is to consider a hypothetical candidate for employment, the same age, education and work experience as Ms. Jones. This individual would have problems understanding, remembering and carrying out detailed instructions. However, the ability to, the ability would be retained to perform simple one, two-step tasks at a consistent pace . . . . Are there any jobs in the national economy that would allow these jobs to be performed?

VE -   Millions, millions of jobs.

ALJ -   All right. Can you give us a representative sample, please?

. . .

VE -   All right. I'd like to start then, I guess, at the medium level. You have janitor jobs at the medium level and they are found in numbers of about 12,000 for the state of Tennessee and there are just over 1,000,000 of those in the U.S. economy. There's also – I'm sorry, there's 2,000,000 of those in the U.S. economy. There's also the job as a production helper. The Tennessee economy has about 2,000 of those jobs and the U.S. economy, about 180,000. There is the job as a conveyor feeder-off-bearer, and the Tennessee economy has approximately somewhat 1,000 and the U.S. economy about 40,000.

ALJ -   All right. Now these are medium, unskilled, basic entry-type jobs?

VE -   Yes.

ALJ -   And there are also jobs at the light level and the sedentary level?

VE -   Absolutely, yes.

ALJ - All right. Is this a representative sample of jobs or an exhaustive survey?

VE - That, that's only a representative sample.

ALJ - All right. Now, before we got started, or maybe after we got started, I handed you the medical source statement from Dr., or from Carol Breniski [phonetic], who is the Advanced Practice nurse in psychiatry who's given her opinion of various marked areas of limitation and marked is defined as serious limitation in the area of substantial loss in the ability to effectively function - -

VE - Right.

ALJ - - - and I would think that the first page there is not too bad - -

VE - Right.

ALJ - - - the comples, but then we get into social interaction public, supervisors and co-workers - -

VE - Yes, sir.

ALJ - - - and also the respond to usual work situations - -

VE - Yes, sir.

ALJ - - - in a routine work setting and changes, marked also.
VE - Yes, sir.

ALJ - What about those limitations?

VE - Those limitations would not allow a person to work on a

continuing and ongoing basis in the competitive labor
market.

TR 46-48.

As discussed in detail above, the ALJ, after evaluating Plaintiff at the hearing and

examining the overall evidence of record, determined that Plaintiff retained the RFC to perform a

full range of work at all exertional levels with certain nonexertional limitations. TR 15-21. This

determination was proper. Because the ALJ's hypothetical question upon which he relied

accurately represented Plaintiff's limitations as he deemed credible, the ALJ properly relied on

the VE's answer to the hypothetical question to prove the existence of a significant number of

jobs in the national economy that Plaintiff could perform. *See Felisky*, 35 F.3d at 1036;

*Hardaway v. Secretary*, 823 F.2d 922, 927-28 (6th Cir. 1987); and *Varley*, 820 F.2d at 779.

Accordingly, Plaintiff's claim fails.

## 8. Plaintiff's Obesity

Plaintiff argues that the ALJ erred in not properly considering her obesity and its effect on

her ability to work. Docket No. 14-1 at 17-19. Specifically, Plaintiff contends that the ALJ did

not properly consider her obesity's effect on her functional limitations in making his RFC

determination. *Id.* Additionally, Plaintiff argues that the ALJ failed to properly explain his

conclusion and failed to "request any information from the vocational expert regarding any

possible effects the claimant's obesity might have on her ability to work." Docket No. 14-1 at 18.

Defendant responds by noting that neither Plaintiff, nor a medical source of record, cited

any functional limitations resulting from Plaintiff's obesity. Docket No. 17 at 19-20. Defendant

41

also observes that Plaintiff's job history reflects an ability to meet the physical and mental demands of unskilled work activity, as noted by the ALJ. *Id.*; TR 19. Defendant essentially contends that Plaintiff's lacking a demonstrated functional limitation resulting from her obesity renders Plaintiff's obesity irrelevant to the determination of disability. Docket No. 17 at 19-20.

Plaintiff is correct that obesity can be a severe impairment that causes functional limitations; however, the Regulations require a claimant to prove the degree of functional loss resulting from obesity, as the claimant bears the burden through step four of the five-step sequential evaluation. *Her*, 203 F.3d at 391 (6th Cir. 1999). Plaintiff has failed to do so. Plaintiff, at her hearing, never alleged any problems caused by her weight. TR 27-50. Additionally, Plaintiff failed to claim any physical disabilities, stemming from her obesity or otherwise, on her application for SSI. TR 145-47, 168-87. Furthermore, Plaintiff fails to cite any medical evidence of record suggesting an aggravation of her symptoms or functional limitations as a result of her weight. Docket No. 14-1 at 17-19.

As discussed above, the ALJ's opinion demonstrates that he properly reviewed and considered the medical evidence of record when determining Plaintiff's functional limitations. Accordingly, Plaintiff's argument fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14)

days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


E. CLIFTON KNOWLES
United States Magistrate Judge